**TODD SHIPYARDS CORPORATION, a corporation, Plaintiff,**

v.

**MARINE VESSEL LEASING CORPORATION, a corporation, et al., Defendants.**

**Civ. A. No. CV 78–0583–AAH.**

United States District Court, C. D. California.

Sept. 8, 1978.

---

See also, 456 F.Supp. 1384.

Mark S. Evens, Department of Justice for defendant Secretary of the Navy.

Herbert L. Fenster, Joe G. Hollingsworth and Jed L. Babbin, Sellers, Connor and Cuneo, Washington, D. C., Nowland C. Hong, and Richard A. Clark, of Parker, Milliken, Clark & O'Hara, Los Angeles, Cal., for plaintiff Todd Shipyards Corps.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAUK, District Judge.

This matter having come before the Court on the Secretary of the Navy's Motion to Dismiss or, in the Alternative, for Summary Judgment, plaintiff's Opposition thereto, argument having been heard, and the Court having been fully advised in the premises now, therefore, it has entered the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1.  On February 4, 1971, the Navy's Military Sealift Command (MSC) issued Re-

quest for Proposals (RFP) No. N0003371R0016 pursuant to 10 U.S.C. § 2304(a)(10) for the long-term bareboat or time charter of up to nine 25,000 dead weight tonnage (DWT) tankers to be constructed by the successful offeror. [Secretary's Exhibit 1].

2. When MSC is unable to satisfy its logistical requirements in support of Department of Defense installations with ships in the United States Merchant inventory, MSC has entered into agreements to charter ships to be constructed by private owners for subsequent delivery under charter to MSC. [Affidavit of Dudley J. Clapp, Jr.]

3. MSC has acquired the use of twenty-eight ships in this manner, including the four 25,000 DWT tankers constructed by Todd for Marine Vessel. [Id.]

4. Military agencies including the Department of the Navy are authorized to purchase or to contract to purchase necessary property and services by 10 U.S.C. Chapter 137, §§ 2301–2314, and by the Armed Services Procurement Regulations ("ASPR") promulgated under 10 U.S.C. § 2202 and §§ 2301–2314. [Secretary's Exhibit 7].

5. MSC has been designated a "procuring activity" of the Navy under 1–201.14 of ASPR. [Id.]

6. The instant RFP required that the charters be for a firm five-year term with options for renewal up to a maximum of twenty years. [Id.]

7. On June 11, 1971, the Navy received offers from thirteen entities offering to charter such tankers to Navy in compliance with the RFP.

8. After negotiating with each of the offerors, Navy selected a consortium consisting of Marine Transport Lines, Inc., Citicorp Leasing, Inc., and Salomon Brothers as the lowest responsible bidders.

9. Award was made to the consortium on August 24, 1971, conditional on its ability to arrange for the necessary financing and construction of nine tankers. [Secretary's Exhibit 2].

10. Navy reserved the right to approve the terms and conditions of the contraction contract between the consortium and the shipyards. [Id.]

11. Thereafter, the consortium entered into negotiations with the three shipyards, Todd, Bath, and NASSCO, with regard to specifications, contract terms and conditions, and price. [Affidavit of Dudley J. Clapp, Jr.].

12. On December 28, 1971, the consortium executed a fixed price contract with Todd for the construction of four tankers at a total price of $66.8 million. [Secretary's Exhibit 3].

13. This contract was conditional upon the completion of the necessary financing by the consortium and the execution of contracts between the consortium and Navy. [Id.]

14. Navy did not participate directly in the negotiations between the consortium and Todd although it gave its approval to the terms of the contract. [Affidavit of Dudley J. Clapp, Jr.].

15. The Navy, upon reviewing the ship design and specifications, discovered a substantial number of errors and deficiencies in the design which it requested the consortium to correct prior to the execution of any agreements between the consortium and the prospective shipyards.

16. The consortium negotiated these changes with the yards and secured revised prices prior to executing the conditional construction contracts.

17. By letter dated December 27, 1971, the consortium requested from the Comptroller General of the United States an opinion as to the propriety of Navy funding from the Navy Industrial Fund and its obligation to pay charter hire. [Secretary's Exhibit 4].

18. On March 23, 1972, the Comptroller General advised the consortium that in his opinion sufficient obligational authority ex-

isted in the Navy Industrial Fund to permit the Contracting Officer to execute the charters. [Secretary's Exhibit 5].

19. The General Counsel of the Navy requested the opinion of the Attorney General of the United States as to the legality of the proposed procurement with specific reference to whether the obligations to pay charter hire were backed by the full faith and credit of the United States. [Secretary's Exhibit 6].

20. On June 20, 1972, the Assistant Attorney General in charge of the Office of Legal Counsel set forth his opinion that MSC had the authority to enter into the Agreements to Construct and Let and the Demise Charters; that those documents when executed would constitute valid and binding obligations of the United States, enforceable in accordance with their respective terms; and that such obligations of the United States were not conditional upon future appropriations of funds by Congress. [Secretary's Exhibit 7].

21. Prior to June 20, 1972, the consortium had formed Marine Vessel Leasing Corporation (Marine Vessel), capitalized at $500, to act as the contractual vehicle with which all parties would contract.

22. In its December 28, 1971 contract with the consortium, Todd specifically agreed that it would execute a construction contract with a "nominally capitalized corporation" to be formed by the consortium. [Secretary's Exhibit 3].

23. On June 20, 1972, a Contracting Officer of MSC executed with Marine Vessel a single agreement to Construct and Let a separate charter for each of the four tankers to be built by Todd (Plaintiff's Exhibits D and 30), which were to become effective when the ship nominated therein was accepted for delivery by MSC from the owners.

24. The Agreement to Construct and Let was an agreement by Marine Vessel to construct the vessels and by MSC to accept the vessels when delivered, which did not obligate MSC to expend any moneys unless MSC terminated the agreement. [Plaintiff's Exhibit D].

25. Simultaneous with the execution of the agreements with MSC, Marine Vessel executed separate construction contracts with Todd for each of the four ships to be constructed by Todd, and a contract with Marine Transport Lines, Inc. whereby the latter agreed to act as the supervisor of construction [Plaintiff's Exhibits C and L].

26. In addition, Marine Vessel entered into a contract with fourteen prospective owners, denominated "Equity Participants" in the complaint, whereby the owners agreed to invest 25 percent of the capitalized costs of construction; Marine Vessel also executed an agreement with thirty-seven institutions by which they agreed to purchase bonds to be issued by Marine Vessel and secured by a First Preferred Ship Mortgage, equal to 75 percent of the capitalized costs of the ships.

27. Various other agreements were executed between the various parties to consummate the transaction.

28. These agreements provided in part that upon delivery to Marine Vessel of a completed vessel, Marine Vessel would transfer title to the ship to Irving Trust as trustee for the fourteen "Equity Participants." [Affidavit of Dudley J. Clapp, Jr.].

29. Although MSC reviewed and approved the underlying agreements, it did not participate in direct negotiations with any of the parties to the transaction except the consortium. [Affidavit of Dudley J. Clapp, Jr.]

30. The only contracts MSC executed were with Marine Vessel, *i. e.*, the Agreement to Construct and Let and the four Demise Charters.

31. Following the execution of its contract with Marine Vessel on June 20, 1972, Todd commenced the construction of the four tankers.

32. The Comptroller General reviewed the Build and Charter Program in a Report to the Congress dated August 15, 1973. [Todd's Exhibit 3].

33. The Comptroller noted "By *renting instead of purchasing* the Navy can apply

Operation and Maintenance (O&M) funds which, unlike procurement funds, do not require specific authorization and approval by the Congress" [*Id.* (emphasis added)]. The report also notes that the Navy and the shipbuilders have no *direct* contractual arrangement. [*Id.* at 166 (emphasis added)]. The report concludes with the suggestion concurred in both by the Department of Defense and by Navy, that in future build and charter programs, Congress should be provided full information.

34. Pursuant to Article XVI of its construction contracts with Marine Vessel, Todd was obligated to give ten days notice of the intended delivery date of the ship and a statement of the total cost of the ship. [Plaintiff's Exhibit C].

35. At delivery, Todd was also obligated to provide a certificate of "no liens" against the ship. [Plaintiff's Exhibit C].

36. On July 26, 1974, Todd gave Marine Vessel the ten-day notice of the intended delivery of the first ship. [Secretary's Exhibit 8].

37. For the first time, Todd also notified Marine Vessel that it was claiming $2.6 million additional costs for acts of the owners allegedly committed during the construction period, [Secretary's Exhibit 8] and indicated that it would present claims on the remaining three ships in an unknown amount.

38. As a result of negotiations between Marine Vessel and Todd, Todd agreed to limit its total claim on all four ships to $2.6 million. [Secretary's Exhibit 9].

39. MSC in turn agreed that the moneys available under the initial financing would be deposited in a Deferred Capitalized Cost Account and that it would reaffirm its obligation to pay as additional charter hire any deficit in the Deferred Capitalized Cost Account up to $650,000 per vessel. [Secretary's Exhibit 10].

40. Todd delivered the last ship to Marine Vessel, which in turn chartered it to Navy, on August 29, 1975.

41. The tender of delivery for each of the remaining three ships was accompanied by a notice, pursuant to Article XVI of Todd's contract with Marine Vessel, of claimed additional costs. [Secretary's Exhibits 11, 12, 13].

42. In each case, however, Todd reaffirmed its agreement to limit the overall claims to $2.6 million. [*Id.*]

43. By the time the fourth ship had been delivered, the additional amounts claimed by Todd totaled $30.1 million. [*Id.*]

44. At the time of delivery of each vessel, Todd executed a *Certificate of No Liens or Rights in Rem and Release*, [Secretary's Exhibit 14] which was accompanied by an opinion from Todd's attorneys that "good and marketable title of the [vessels] had been duly conveyed by Todd to [Marine Vessel] free and clear of all liens, charges and encumbrances." [Secretary's Exhibit 15].

45. On March 9, 1976, at a meeting with the Commander, MSC, and counsel to MSC, Todd representatives submitted a claim to MSC entitled Request for Additional Compensation in the amount of $31.5 million under cover of a letter of that same date. [Secretary's Exhibit 16].

46. On April 5, 1976, Todd's claim was formally rejected by MSC on the grounds that there was no privity of contract between Todd and the Government and that no further action would be taken on its claim. [Secretary's Exhibit 17].

47. Todd's claim for additional compensation was referred by MSC to the attorneys for the owners to whom MSC forwarded a copy of Todd's claim. [Secretary's Exhibit 18].

48. Marine Vessel, through its attorneys, offered to meet with Todd's representatives to explore the merits of Todd's claims. Several such sessions were held between April 1976 and early 1977 in an attempt to resolve the dispute [Affidavit of Grant B. Hering, June 9, 1978].

49. Todd was also informed that Marine Vessel had substantial counterclaims against Todd for liquidated damages based upon late delivery of the tankers; deficien-

cies in construction either existing at the time of delivery or developing during the guarantee period; breach of contract; and negligent installations of certain equipment resulting in fires and explosions. [Secretary's Exhibit 14].

50. When negotiations failed to achieve a settlement either of Todd's claims or Marine Vessel's counterclaims, Marine Vessel invoked the arbitration clause contained in the construction contracts by letter dated March 18, 1977. [*Id.*]

51. On April 8, 1977, Todd commenced an action in the New York State Supreme Court to stay arbitration.

52. In an opinion dated June 14, 1977, that Court granted Marine Vessel's application "to compel arbitration of its disputes with Todd."

53. By an Order and Judgment dated August 23, 1977, as modified on September 20, 1977, that Court ordered Todd to arbitrate Marine Vessel's claims against Todd and stayed arbitration of Todd's claims against Marine Vessel until such time as Todd asserted such claims in a forum other than arbitration under the Marine Vessel agreement. Both Todd and Marine Vessel appealed from parts of that order.

54. Following commencement by Todd of the instant action in this Court on February 10, 1978, Marine Vessel, by Order to Show Cause in Todd's New York proceeding, moved for an order compelling Todd to arbitrate the claims asserted against Marine Vessel in this action.

55. Todd cross-moved for a stay of arbitration in New York pending resolution of the action in this Court.

56. The New York Supreme Court expressly held that Todd's challenge to the validity of the arbitration clause was untimely under § 7503(c) of the New York Civil Practice Law and Rules and that the arbitration clause was valid.

57. On April 25, 1978, that Court, based on the record which has been developed and on the above-mentioned memorandum decision ordered, *inter alia*, that Todd be directed to proceed to arbitrate all such disputes as provided for in the arbitration agreements in the construction contracts.

58. Meanwhile, on February 10, 1978, Todd had instituted this action against Marine Vessel, Marine Transport, Citicorp, the Secretary of the Navy, Irving Trust Company, Manufacturers Hanover Trust Company, and some, but not all, of the Equity Participants and Bond Purchasers.

## CONCLUSIONS OF LAW

1. There are no genuine issues of material fact in dispute.

2. The first four counts against the Secretary seek to render the Secretary directly liable in damages to Todd for the alleged breaches by Marine Vessel of its construction contracts with Todd, which breaches are subject to arbitration under the decree of the New York Supreme Court, Special Term.

3. The use of arbitration as a means of settling disputes has been accorded specific Congressional endorsement in the Federal Arbitration Act and should be encouraged by the federal courts. *Aerojet-General Corp. v. American Arbitration Ass'n*, 478 F.2d 248, 251 (9th Cir. 1973).

4. Judicial review prior to the rendition of a final arbitration award should be indulged, if at all, only in the most extreme circumstances, which are not present in this action. *Id.* at 251.

5. Todd's full release of all claims in its *Certificate of No Liens or Rights in Rem and Release* applies factually, legally, by implication and inferentially to its claims against the Navy, both directly and as third-party beneficiary.

6. The Navy's Leasing Agreements with Marine Vessel are not illegal.

7. Todd lacks standing, both as a taxpayer and as a contractor with Marine Vessel, to challenge the legality of the Leasing Agreements executed between the Secretary and Marine Vessel.

Now, therefore, on this 8th day of September, 1978, let judgment for the Secretary of the Navy be entered accordingly.